UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

ROSS H. MANDELL,                                          10 Civ. 6530 (RJS)

                 Petitioner,                          **ECF CASE**

     - against -

NICHOLAS SPENCER REEVE, Individually and
on Behalf of PROSTAR 2000,

              Respondents.
-------------------------------------------------------------------x


## MEMORANDUM OF LAW OF PETITIONER
## ROSS H. MANDELL IN SUPPORT OF
## <u>PETITION TO VACATE ARBITRATION AWARD</u>



**HOFFMAN & POLLOK LLP**

*Attorneys for Petitioner Ross H. Mandell*
**260 Madison Avenue, 22nd Floor**
**New York, New York 10016**
**Tel: (212) 679-2900**
**Fax: (212) 679-1844**


*Of Counsel*:
    Jeffrey C. Hoffman
    William A. Rome
    Lisa Rosenthal
    Samira H. Desai

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

ROSS H. MANDELL,                                                    10 Civ.

                              Petitioner,

         - against -

NICHOLAS SPENCER REEVE, Individually and
on Behalf of PROSTAR 2000,

                              Respondents.
-------------------------------------------------------------------x

## MEMORANDUM OF LAW OF PETITIONER
## ROSS H. MANDELL IN SUPPORT OF
## <u>PETITION TO VACATE ARBITRATION AWARD</u>

### <u>Preliminary Statement</u>

Petitioner Ross H. Mandell ("Mandell") submits this memorandum of law in support of

his Petition to vacate, as to him, the arbitration award issued on July 26, 2010 (the "Award") in

the proceeding captioned *Nicholas Spencer Reeve, Individually and on Behalf of Prostar 2000 v.*

*Granta Capital Group LLC, Michael R. Passaro, Ross H. Mandell, Robert R. Goss, and Stephen*

*W. Shea,* FINRA-DR Arb. No. 09-02329 (the "Arbitration"), in favor of Claimant Nicholas

Spencer Reeve ("Reeve") and Prostar 2000 ("Prostar") (collectively, "Claimants"). The Award

was issued in complete disregard of Mandell's proper and timely notice that he was unable to

attend the hearing in the Arbitration, on a hearing date that was set without his input despite his

sincere efforts to participate *pro se* in the Arbitration. As is discussed below, by continuing with

the hearing without Mandell present notwithstanding his repeated requests for postponement, the

arbitrators engaged in misconduct pursuant to 9 U.S.C. § 10(a)(3). As a consequence, the Award

must be vacated as to him.

In addition, the Award must be vacated because it was issued in manifest disregard of the law and facts. Claimants failed to make out a *prima facie* case against Mandell on the claims against him; even in the absence of a respondent, a *prima facie* showing is needed to support an arbitration award against a respondent. Moreover, the arbitrators were advised, in advance of the hearing, that on the facts pleaded in the statement of claim there was no basis for an award against Mandell as a matter of law. The arbitrators ignored this clear and unchallenged law in issuing the Award. This too requires vacatur of the Award.

**STATEMENT OF FACTS**

**A.    Background**

Mandell has been in the securities business since 1983 (*see* the attached declaration of Ross H. Mandell executed on August 31, 2010 ("Mandell Dec.") at ¶ 2). In 2002, he and others formed Sky Capital LLC ("Sky Capital"), a broker-dealer that was registered with the Securities and Exchange Commission (*id.* at ¶ 3). In 2008, after Mandell resigned from the firm, Sky Capital became Granta Capital Group LLC ("GCG") (Mandell Dec. at ¶ 4). Mandell served during a portion of the time he was associated with Sky Capital as the Chief Executive Officer (*id.* at ¶ 3). During the period of time covering the trading at issue in the Arbitration, however, Mandell was not in the supervisory chain over Respondent Michael R. Passaro ("Passaro"), the registered representative Claimants dealt with (*id.*).

Mandell is not a lawyer and has no legal training (*id.* at ¶ 5). Although he has been named as a Respondent in other securities industry arbitration hearings, he has always been defended by counsel retained by his employer at the time (*id.*).

In or about July 2009, the United States Attorney for the Southern District of New York unsealed a criminal indictment in a case captioned *United States v. Ross H. Mandell, et al.,*

2

Docket No. 09-Cr.-662 (*see* the accompanying declaration of Jeffrey C. Hoffman executed on August 31, 2010 ("Hoffman Dec.")), Ex. 1).  The indictment alleges that Mandell committed securities, mail and wire fraud, and engaged in a conspiracy to commit such fraud, in connection with his association with GCG and other entities (*id.*).

**B.**    **The Arbitration**

**1.**    ***The Statement of Claim***

Claimants filed the Statement of Claim dated April 16, 2009 in the Arbitration (the "Statement of Claim") (Hoffman Dec., Ex. 2) before the Financial Industry Regulatory Authority's dispute resolution division ("FINRA").  The Statement of Claim alleges a pattern of fraudulent and other improper conduct against Passaro, the registered representative who handled Claimants' accounts (*id.* at ¶¶ 11-22).  Claimants allege that Passaro made false and misleading representations to Claimant Nicholas Spencer Reeve ("Reeve") from the time he was cold-called by Passaro through at least 2007 (*id.*).  Claimants *do not* allege that Claimants were ever contacted by or spoke to Mandell, nor do they claim that Mandell directly or indirectly took any action to harm them (*id.*).  The only claims that reasonably could be understood, based on the allegations in the Statement of Claim, to apply to Mandell are for breach of fiduciary duty (Seventh Count, *id.* at ¶¶ 62-65), and for failure to supervise Passaro (Eighth Count, *id.* at ¶¶ 66-72).[1]  For the reasons discussed below, Mandell has complete defenses to those claims.

---

[1]    Each of the nine claims in the Statement of Claim is alleged against all the Respondents, but only the Seventh and Eighth Counts make allegations of misconduct against Mandell and, as noted above, those are only failure to supervise and breach of fiduciary duty (*see* Hoffman Dec., Ex. 2 at ¶¶ 28-77). None of the factual allegations in the Statement of Claim state that Mandell engaged in any direct or indirect misconduct *vis a vis* Claimants (*see* above).

### 2. *Mandell's Contacts With FINRA Staff and the Resulting Prejudice to Mandell*

#### a. *FINRA Fails to Serve Mandell Timely*

Mandell was never served with a copy of the Statement of Claim by FINRA pursuant to FINRA's Code of Arbitration Procedure (the "Code") (Mandell Dec. at ¶ 6), notwithstanding that it appears that FINRA Dispute Resolution has always had his correct mailing address (Hoffman Dec., Ex. 3). At the hearing, Claimant's counsel even stated that FINRA was in possession of Mandell's correct mailing address *(id.*, Ex. __ at 57-58*).* Mandell first learned of the pendency of this arbitration proceeding on or about July 24, 2009 *(id.*, Ex. 4). Mandell immediately called the phone number for FINRA and left two messages for Bola Aguda ("Aguda"), the FINRA case administrator at the outset of the arbitration, informing him that he had not received the Statement of Claim *(id.*). Mandell also sent Aguda a letter and an e-mail dated July 24, 2009, in which he memorialized FINRA's failure to serve him *(id.*). Mandell did not receive the Statement of Claim or Claimants' Submission Agreement until receiving a letter dated August 4, 2009 from Nicole C. Haynes ("Haynes"), the FINRA case assistant manager at the time *(id.*, Ex. 5).[2]

#### b. *FINRA Denies Mandell's Motion to Delay Arbitration*

On or about August 17, 2009, Mandell mailed to Aguda and Haynes a letter motion requesting that the arbitrators delay the hearing in the arbitration until after the resolution of the criminal case against him (*see* Hoffman Dec., Ex. 7). It appears that the motion was denied on or about November 11, 2009, without prejudice to Mandell's renewing it after completion of discovery *(id.*, Ex. 8).

---

[2] In the meantime, Claimants' attorney moved for a default finding against Mandell, which was ultimately denied by the FINRA staff after receiving Mandell's answer (*see* Hoffman Dec., Ex. 6).

c.      *FINRA Fails to Help Mandell to Obtain Discovery*

Although the Code permits parties to obtain discovery from one another, Mandell did not

understand, as a *pro se* litigant, that he was entitled to obtain discovery from Claimants and he

never requested the production of documents or other evidence (Mandell Dec. at ¶ 8).  Moreover,

Claimants never made any production to Mandell in accordance with Rules 12500, 12505 and

12506 of the Code (*id.*).

d.      *Arbitrator Displays Bias Against Mandell*

Another issue cropped up in or about September 2009.  One of the arbitrators, Adam M.

Kauff, submitted an additional arbitrator's disclosure in which he disclosed that he represented

Morgan Stanley Smith Barney in two pending arbitrations filed by Claimants' counsel, and that

he had been adverse to Claimants' counsel on a previous occasion (Hoffman Dec., Ex. 9).  This

raised concerns on Mandell's part that Arbitrator Kauff might be biased against him.[3]  As a *pro*

*se* litigant, however, Mandell did not know how to object to Arbitrator Kauff's continued

participation in the matter (Mandell Dec. at ¶ 9).

e.      *Hearing Date Set Without Mandell's Participation*

There was substantial correspondence concerning the setting of the date for the initial

pre-hearing conference.  Beginning on or about October 12, 2009, Mandell learned that FINRA

had, apparently unilaterally, set a pre-hearing conference date for October 20, 2009 at 10:30 a.m.

(Hoffman Dec., Ex. 10).  Mandell immediately advised Haynes that he was unavailable that day

(*id.*).  Mandell proposed the alternative of the week of November 8, 2009 (*id.*).  One of the

arbitrators then became unavailable and the pre-hearing conference was rescheduled for

---

[3]      During one of the attempts to hold a conference call with the arbitrators (*see* below), where not all
parties or arbitrators were present, Arbitrator Kauff made some remarks about his friendly relationship
with Nicholas J. Guiliano, Claimants' counsel, and spoke dismissively to Mandell when he questioned the
relationship (Mandell Dec. at ¶ 9).  This added to Mandell's concerns about possible bias against him
(*id.*).

November 19, 2009 at 10:00 a.m. (*id.* at Exs. 8, 11).  This date also was rescheduled at the instance of either the arbitrators or FINRA Dispute Resolution, for January 6, 2010 at 10:00 a.m. (*id.* at Ex. 12).  Mandell was supposed to be added to the call, but at the last minute the chairman was unavailable and the conference did not go forward (*id.* at Ex. 13).

Claimants offered dates in February 2010, but Mandell was not sent a letter suggesting these dates, as Louise Feliciano of the FINRA Dispute Resolution staff admitted in an e-mail to Mandell dated February 3, 2010 (Hoffman Dec., Ex. 14).  Mandell was unavailable in February and requested dates in March and April.  Mandell offered the weeks of March 15 or 22, 2010 as available for a call (*id.* at Ex. 15) and a call was scheduled for March 22, 2010 at 10:00 a.m. (*id.* at Ex. 16), but one or more arbitrators were not available.  Kareem Denny ("Denny"), a Logistical Assistant with FINRA, suggested April 2, 6 and 7, 2010 (*id.* at Ex. 17).  By letter dated March 30, 2010, Haynes set the conference call for April 7, 2010 at 4 p.m. (*id.* at Ex. 16).

Mandell notified Denny by e-mail on April 6, 2010 that he would be traveling in Los Angeles, California on April 7th, but he provided a phone number and asked to be added to the call (*id.* at Ex. 17).  Despite this, Mandell was never called (Mandell Dec. at ¶ 10).  Mandell sent e-mails to the FINRA Dispute Resolution staff on April 6 and 9, 2010, attempting to find out why he was not put into the call, but received no substantive response (Hoffman Dec., Ex. 17).

On or about April 9, 2010, an Initial Pre-Hearing Conference Order was issued purporting to summarize what occurred during the pre-hearing conference on April 7, 2010 (the order does not indicate what time the call began) (Hoffman Dec., Ex. 18).  Among the matters addressed in the order is the setting of the hearing date for July 9, 2010 beginning at 9:30 a.m.  The order clearly shows that Mandell was not placed into the call (*id.*).

Mandell learned for the first time, on or about April 20, 2010, that the April 7th pre-hearing teleconference had been held without him and the arbitrators had set a hearing date, when he received a letter dated April 15, 2010 from Archna Curry ("Curry") — who Mandell was informed by another letter dated April 15, 2010 had become the new case administrator — enclosing the Case Information Sheet and notifying him of the hearing date (Hoffman Dec., Ex. 19).  Mandell protested immediately that he was unavailable on that date, that he had not been included in the conference despite his availability to participate, and that he was being prejudiced (*id.*, Ex. 20).  About a week later, Mandell spoke directly with Curry, who told him that she had researched what happened and learned that Denny had forgotten to call Mr. Mandell on April 7, 2010 to add him to the conference (Mandell Dec. at ¶ 11).  In spite of this blatant failure by the FINRA Dispute Resolution staff, Curry refused to take any steps to rectify the issue or even to inform the arbitrators of what had happened (*id.*), thus leaving them with the false impression that Mandell did not participate in the pre-hearing conference by choice.

      *f.*    *FINRA Delays Ruling on Mandell's Renewed Motion to Stay*

By e-mail dated April 30, 2010, Mandell renewed his motion to stay the hearing pending the resolution of his criminal case (Hoffman Dec., Ex. 21).  Thereafter, Mandell inquired repeatedly of the FINRA Dispute Resolution staff regarding the status of this motion, but he received no substantive response; indeed, it was clear that the FINRA Dispute Resolution staff did not even act administratively on the motion (to send it to the arbitrators or notify Claimants of their time to respond) until May 26, 2010 (*id.*, Ex. 22).[4]

---

[4]      On or about June 16, 2010, Mandell received an e-mail from Claimants' counsel notifying him that the hearing was to be held on July 8, 2010 (which was not the correct date).  Mandell immediately protested that he was not available and had been denied the right to participate through having been excluded from the pre-hearing conference.  *See* Hoffman Dec., Ex. 23.

As of July 6, 2010, Mandell had still not been notified about the disposition of his renewed motion to stay the hearing, although he e-mailed the FINRA Dispute Resolution staff on June 16, June 28, June 29, July 3 and July 6, 2010, imploring the staff to find out and get back to him (Hoffman Dec., Ex. 23). In fact, on June 29, 2010, Mandell e-mailed Curry indicating that he expected the hearing not to begin on July 9, 2010 because he had heard nothing about the motion; Curry did not respond (*id.*).

On July 6, 2010, three days before the hearing was scheduled to begin, Curry finally notified Mr. Mandell that his motion had been denied and the hearing was to begin — as scheduled at the April 7, 2010 pre-hearing conference from which he had been excluded — on July 9, 2010 (Hoffman Dec., Ex. 24).

        g.    *Arbitrators Deny Mandell's Motion to Postpone Hearing*

After receiving the denial of his motion to stay the hearing, Mandell retained counsel solely for the purpose of seeking a postponement of the hearing, in view of his unavailability on July 9th. The day after he learned that the hearing was to proceed on July 9th, Mandell, by counsel, made an emergency motion to stay the hearing, by letter motion dated July 7, 2010 (Hoffman Dec., Ex. 25). In the motion, Mandell's counsel explained the facts leading to the prejudice Mandell suffered, and set forth the clear law showing that the denial of a postponement of the hearing would constitute arbitrator misconduct (*id.* at 2-6). The motion also shows that as a matter of law Claimants' claims could not result in a liability finding against Mandell (*id.* at 9-16), and that FINRA's treatment of him had made it impossible for Mandell to prepare adequately for a hearing (*id.* at 17).

Claimants opposed the emergency motion (*id.*, Ex. 26). Claimants' opposition papers did not address the facts alleged in the emergency motion regarding the harm to Mandell that had

resulted from FINRA's conduct, nor did Claimants contest the clear showing made by Mandell that the claims against him had no legal basis.  Mandell, again through counsel, replied in a letter to Curry dated July 7, 2010,[5] pointing out the fact that his legal showing was essentially uncontested and urging anew that the hearing be postponed so he could participate (*id.*, Ex. 27).

On July 8, 2009 Mandell received notification that the arbitrators had denied his emergency motion and refused to stay the hearing (Hoffman Dec., Ex. 28).

### 3.    *The Hearing*

The July 9, 2010 hearing went on as scheduled despite Mandell's inability to attend (Hoffman Dec., Ex. 29).  The transcript shows Arbitrator Cutler stating at the start of the hearing that he still hoped "Mr. Mandell comes to the hearing…I hope he makes it here today to present a defense" (*id.* at 4), even though the arbitrators were fully aware, via the emergency motion they had denied the day before, that Mandell was not available.

Claimants' direct case was two-fold: first, Reeve testified as to how he believed he had been wronged (Hoffman Dec., Ex. 29 at 20-49).  Reeve recited chapter and verse about how Passaro had contacted him, made misrepresentations, and generally mishandled Claimants' account (*id.*).  Reeve conceded, however, that the only personal contact he had ever had with Mandell was a "personal chat" at the Dorchester Hotel in London in 2004 or 2005 (*id.* at 21-22), followed by a public presentation Mandell made at the House of Lords, which Reeve attended (*id.* at 33-34, 45).  Indeed, Reeve did not claim that Mandell did or said anything that caused him harm (*id.*).

---

[5]    The letter was misdated. It actually was signed and sent out on July 9, 2010 (*see* Hoffman Dec. at ¶ 30).

Second, Claimants' counsel made an oral presentation and offered documents into evidence (Hoffman Dec., Ex. 29 at 53-72).[6] Counsel argued that Mandell had been served properly with the Statement of Claim and had notice of the hearing and, therefore, he received all the process that was due him (*id.* at 65-66); counsel did not address the specifics of FINRA's thwarting of his participation in the scheduling of the hearing or the arbitrators' refusal to postpone the hearing. Counsel also argued that Mandell should be held responsible for Passaro's conduct because he allegedly supervised Passaro; counsel relied for this contention on the fact that Mandell had a securities industry supervisory license and was the Chief Executive Officer of GCG (*id.* at 68-69), but did not offer any evidence showing that Mandell actually supervised Passaro. Nor did counsel offer any evidence showing that Mandell either controlled Passaro's conduct or was otherwise culpable for Passaro's conduct. Counsel conceded that

> the allegations that are made in the federal complaints, the SEC
> complaint, the criminal complaint, are not in and of themselves
> evidence. They are just mere allegations that the government is
> making. There has been no proof of those allegations.

*Id.* at 66-67.

### 4.   *The Award*

The hearing, where Claimants appeared with no opposition, resulted in the Award (Hoffman Dec., Ex. 30). Claimants were awarded compensatory damages in the amount of $367,295.00 and interest at the rate of 9% *per annum*, and the Award included hearing fees of $3,375.00 and an additional $300.00 in non-refundable filing fees incurred by Claimants (*id.* at 4). The Award directed that GCG, Passaro, Mandell and Respondent Shea were jointly and severally liable for these amounts (*id.* at 3-4).

---

[6]     Mandell does not have copies of the exhibits entered into evidence at the hearing, since Claimants never provided him with a copy of those (or any other) documents (Hoffman Dec. at ¶ 3). Mandell relies on the descriptions of the exhibits in the transcript in the following discussion.

## ARGUMENT

### POINT I

#### THE ARBITRATION AWARD MUST BE VACATED ON THE GROUND OF MISCONDUCT BY THE ARBITRATORS FOR FAILING TO POSTPONE THE HEARING DESPITE MANDELL'S SHOWING OF SUFFICIENT CAUSE

Under the Federal Arbitration Act, an arbitration award may be vacated where "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown…." 9 U.S.C. § 10(a)(3).[7] Arbitrators must give each party to a dispute an adequate opportunity to present its evidence and argument. *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (arbitrators' refusal to continue hearings to allow respondent's former president to testify because of former president's temporary unavailability due to wife's cancer diagnosis amounted to fundamental unfairness and misconduct sufficient to vacate arbitration award); *see also Allendale Nursing Home Inc. v. Local 115 Joint Bd.*, 377 F. Supp. 1208 (S.D.N.Y. 1974) (refusal of arbitrator to adjourn hearing when administrative assistant was sent to hospital after being noticeably ill in front of arbitrator was an abuse of discretion, requiring vacatur of award); *British Ins. Co. of Cayman v. Water St. Ins. Co., Ltd.*, 93 F. Supp. 2d 506, 517 (S.D.N.Y. 2000) (*citing Tempo Shain*).

---

[7]      The Federal Arbitration Act applies to this arbitration proceeding because the claims pertain to securities that apparently traded on a national exchange and, therefore, the dispute relates to interstate commerce; moreover, Mandell is a resident of Florida and Claimants are subjects of the United Kingdom (*see* the accompanying Petition dated August 31, 2010 at ¶¶ 2-4). Thus, interstate commerce is implicated. *See, e.g., Wien & Malkin LLP v Helmsley-Spear, Inc.*, 12 A.D.3d 65, 70, 783 N.Y.S.2d 339, 343 (1st Dept. 2004) ("the U.S. Supreme Court has reiterated that Congress' regulation of interstate commerce extends to matters *merely* affecting interstate commerce; hence where the subject matter of an arbitration does so, the FAA is applicable . . ." [emphasis added]) (citing *Citizens Bank v. Alafabco*, 539 U.S. 52, 56-57, 123 S. Ct. 2037 (2003)), *rev'd on other grounds* 6 N.Y.3d 471, 813 N.Y.S.2d 691, 646 N.E.2d 1201 (2006). *See also Goodwin v. Elkins & Co.*, 730 F.2d 99, 108 (3d Cir. 1984), citing *Southland Corp. v. Keating*, 465 U.S. 1, 104 S. Ct. 852 (1984); *Penrod Mgt. Group v. Stewart's Mobile Concepts, Ltd.*, 2008 WL 463720, at * 2 (S.D.N.Y. Feb. 19, 2008).

In evaluating an arbitrator's denial of a request to postpone an arbitration hearing, courts consider whether there existed a reasonable basis for the arbitrator's decision and whether the denial created a "fundamentally unfair" proceeding. *Bisnoff v. King*, 154 F. Supp.2d 630, 637 (S.D.N.Y. 2001). *See also Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 220 (S.D.N.Y. 2001) (arbitrator can formulate procedures as he sees fit as long as the proceedings are not "fundamentally unfair"). A fundamentally unfair proceeding may result if the arbitrators fail to "give each of the parties to the dispute an adequate opportunity to present its evidence and argument." *Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985) (award vacated due to arbitrator's failure to consider relevant evidence in making award).

The facts of *Tube & Steel Corp. v. Chicago Carbon Steel Prods.*, 319 F. Supp. 1302 (S.D.N.Y. 1970), are strikingly similar to the facts here. Respondent, a Chicago business, had been informed in July that the arbitrators were available for a hearing on August 17, which was acceptable to all parties; Respondent; however, had notified the association that it could not appear before the arbitrators before the week of August 17. Soon thereafter the association issued a notice of hearing for August 10. Promptly on receipt of notice of the hearing Respondent wrote to the association restating that it was not available that week. Respondent reiterated the message in a second letter to the arbitrators and also notified the association's clerk. Notwithstanding Respondent's efforts, the association insisted on holding the hearing on August 10 in the absence of Respondent. Subsequently the arbitrators issued an award against Respondent. *Id.* at 1302-303.

The Court vacated the award, holding that the association was guilty "of behavior which unfairly and unnecessarily prejudiced the rights of the respondent." *Id.* at 1304. The Court

further stated that the Federal Arbitration Act empowered the court to vacate an arbitration award in certain specified circumstances, including where the arbitrators commit misconduct by refusing to postpone the hearing in the face of a party's unavailability. *Id.*

      The reasoning of the Court in *Tube Steel* applies with equal force to this case. The choice of hearing date appeared to be completely arbitrary, based primarily on the convenience of the arbitrators and in complete disregard of Mandell's lack of availability. To compound the overall unfairness to Mandell, he was deprived of any opportunity even to discuss when the hearing should take place, because FINRA failed to connect him to the pre-hearing conference call despite his having given the staff his telephone number the day before (*see* Hoffman Dec., Exs. 17-20). In denying Mandell's request for a postponement of the hearing and allowing the hearing to go forward, the arbitrators unilaterally gave Claimants free reign to present their arguments without any input from Mandell. Mandell did not have a chance to present any evidence pertinent to the controversy. As the Court stated in *Tempo Shain*, "[a]rbitrators must give each party to a dispute an adequate opportunity to present its evidence and argument." 120 F.3d at 20 (quoting *Hoteles Condado Beach*, 763 F.2d at 39). Mandell was deprived of any meaningful opportunity to defend himself when the arbitrators denied his emergency motion for postponement of the hearing.[8] As discussed above, Mandell was not even given notice of the Arbitration until a few months after the case had been initiated and then was excluded from the pre-hearing conference during which the hearing date was selected. Each separate piece of misconduct by FINRA contributed to a record of fundamental unfairness suffered by Mandell. This warrants vacatur of the Award as against him.

---

[8]    Arbitrator Cutler's hope, expressed at the hearing, that Mandell would appear at on July 9th (Hoffman Dec., Ex. 29 at 3-4), notwithstanding that he had made it quite clear he was unavailable, does not, as a practical matter, amount to a meaningful opportunity for Mandell to defend himself.

## POINT II

### THE AWARD MUST BE VACATED BECAUSE THE ARBITRATORS MANIFESTLY DISREGARDED LAW WHEN THEY ISSUED THE AWARD AGAINST MANDELL IN SPITE OF CLAIMANTS' FAILURE TO PROVE THEIR CLAIMS AGAINST HIM

The Second Circuit has recognized that an arbitration award may be vacated if it is in

"manifest disregard of the law." *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2d Cir. 1998),

*cert. denied*, 119 S. Ct. 1286 (1999).  Manifest disregard of the facts also is a basis for vacating

an arbitration award.  *Daily News, L.P. v. Newspaper & Mail Deliverers' Union of New York and*

*Vicinity*, 1999 WL 1095613 (S.D.N.Y. Dec. 2, 1999).  Section 10 of the Federal Arbitration Act

provides grounds for vacating an arbitration award "where the arbitrators exceeded their powers,

or so imperfectly executed them that a mutual, final, and definite award upon the subject matter

submitted was not made." 9 U.S.C. §10(a)(4).  To vacate an award on this ground, a court must

find both that

> 1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and 2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case.

*Halligan*, 148 F.3d at 202; *accord, Dirussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d

Cir. 1997), *cert. denied*, 118 S. Ct. 695 (1998).  In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

*Bobker*, 808 F.3d 930, 933 (2d Cir. 1986), the Second Circuit held that

> [t]he error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.  Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly defined principle but decides to ignore or pay no attention to it.

*See also Daily News*, 1999 WL 1095613, at *7 (arbitrator "manifestly disregarded evidence of

the most critical [factual] nature" concerning financial condition of plaintiff); *Halligan*, 148 F.3d

at 204 ("[i]n view of the strong evidence that Halligan was fired because of his age and the agreement of the parties that the arbitrators were correctly advised of the applicable legal principles, we are inclined to hold that they ignored the law or the evidence or both"). "The 'manifest disregard' doctrine allows a reviewing court to vacate an arbitral award only in 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent.'" *Stolt-Nielson SA v. Animalfeeds Int'l Corp.*, 548 F.3d 85, 91-92 (2d Cir. 2008) (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003)), *rev'd on other grounds* 130 S. Ct. 1758 (2010)).[9]

The transcript of the hearing shows clearly that the arbitrators manifestly disregarded the law and the facts. The arbitrators were well aware that setting a hearing date for a date and time when one of the parties could not be present constituted misconduct, because Mandell had briefed the issue to them only two days before the hearing (in a submission that summarized the months of correspondence and complaints by Mandell regarding FINRA's treatment of him, *see* above), and they had denied the postponement in the teeth of that showing, despite the lack of any meaningful opposition from Claimants. Moreover, as discussed below, Claimants failed to make out a *prima facie* case against Mandell on any of the claims asserted against him. This represents a manifest disregard of the facts as well as the law. It is not that there were disputed facts that the arbitrators resolved in favor of one party and against another. Rather, the arbitrators received no evidence on which, as a matter of law, they could rely to support a belief that Mandell acted culpably. *See Daily News, LP*, 1999 WL 1095613, at *7 (vacating award for

---

[9]    The Second Circuit in *Stolt-Nielsen* relied upon the decision of the Supreme Court in *Hall St. Assocs., LLC v Mattel, Inc.*, 552 U.S. 576, 585, 128 S. Ct. 1396, 1404 (2008), in which the Supreme Court speculated upon whether manifest disregard fell within 9 U.S.C. § 10(a)(3) or 10(a)(4). The Supreme Court did not address the continued viability of that doctrine in the decision. In *Stolt-Neilsen*, the Second Circuit ruled that manifest disregard continued to exist as a theory under which an arbitration award could be vacated following *Hall St.*, *see* 548 F.3d at 94. That holding was not disturbed by the Supreme Court on review, *see* 130 S. Ct. at 1767, n.3.

manifest disregard of facts and holding that "[t]he court holds that the Arbitrator manifestly disregarded evidence of the most critical nature…..").

## A.   Claimants Did Not Submit Evidence Showing that Mandell Was Culpable

In his emergency Motion, Mandell demonstrated that Claimants were unlikely to be able to prove their claims against him at the hearing (Hoffman Dec., Ex. 25 at 10-16). Indeed, at the hearing Claimants offered no evidence of malfeasance by Mandell. Thus, there was a complete failure of proof against Mandell.

Claimant asserted two claims against Mandell: breach of fiduciary duty and failure to supervise (Hoffman Dec., Ex. 2 at ¶¶ 62-72). In addition, although not separately pleaded as claims, Claimants alleged that Mandell was liable as a "control person" of GCG, and under the theory of *respondeat superior* (*id.* at ¶ 9). For each of these claims, Mandell has a complete defense as a matter of law. The arbitrators were informed of these defenses and the legal basis therefore in the emergency motion. Claimants did not rebut that showing. The only explanation for the Award being issued against Mandell, therefore, was the arbitrators' manifest disregard of the law.

## B.   Breach of Fiduciary Duty

In issuing the Award against Mandell, in reliance on the claim of breach of fiduciary duty, the arbitrators manifestly disregarded both the law and the facts. Mandell briefed the following law to the arbitrators in the emergency motion, which the chairman specifically noted that the arbitrators had received (Hoffman Dec., Ex. 29 at 3). As shown below, the authorities preclude liability against Mandell as a matter of law. Moreover, the evidence presented at the hearing did not show any basis for concluding Mandell was liable on that claim.

Count Seven of the Statement of Claim alleges that Mandell breached a fiduciary duty to Claimants by failing "to safeguard Claimants' securities accounts from being managed in a reckless and wrongful manner, and to prevent Claimants' securities accounts from being used as a device to generate commissions and fees." Hoffman Dec., Ex. 2 at ¶ 64. This is wrong as a matter of law. Courts have uniformly held that in a normal (*i.e.*, non-discretionary) account relationship, a fiduciary duty only arises with respect to the execution of a given order, and even then, only once it has been accepted. The New York State Appellate Division, First Department, has affirmed that "[a] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities." *Fekety v. Gruntal & Co., Inc.*, 191 A.D.2d 370, 371, 595 N.Y.S.2d 190, 190-91 (1st Dept. 1993) (citation omitted). In reaching this conclusion, the court cited with approval *Rush v. Oppenheimer*, 681 F. Supp. 1045, 1055 (S.D.N.Y. 1988), which held that the "mere existence of broker-customer relationship is not proof of its fiduciary character."

These decisions follow an unbroken line of cases requiring more than a mere broker/customer relationship alone to posit a fiduciary duty. *See de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir. 2002) (broker for non-discretionary account does not ordinarily have fiduciary duty to customer, observing that "existence of broad fiduciary duty depends on whether broker has 'practical control' of customer's account"); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 707 (2d Cir. 1998) ("[u]nder New York law, '[a] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities'") (quoting *Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 646 N.Y.S.2d 678, 680 (1st Dept. 1996)). *See also Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.*, 800 F.2d 177, 182 (7th Cir. 1986) (broker acting merely as the instrument for executing transactions did not give rise to fiduciary relationship); *Leboce S.A. v. Merrill Lynch*, 709 F.2d 605, 607 (9th Cir.

1983) (only where the agent "for all practical purposes 'controls' the [selection of investments] does California law impose a fiduciary obligation"); *Boley v. Pineloch Assoc. Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988) (requiring some further and special relationship of trust and confidence to support breach of fiduciary duty claim).

The foregoing law was cited to the arbitrators in the emergency motion (Hoffman Dec., Ex. 25 at 11). Claimants did not cite any countervailing authorities on this issue, either in their opposition to the motion or at the hearing.

Claimants did not allege that Mandell took any action with respect to *them* that caused them to repose trust and confidence in *him*. At the hearing, moreover, Reeve testified that he had only met Mandell once at the Dorchester Hotel in London where they had a "personal chat" and that the next and last time he saw Mandell was at the House of Lords where Mandell gave a speech (Hoffman Dec., Ex. 29 at 45). Claimants did not offer any evidence to support a finding that Mandell had discretionary authority over their account; to the contrary, Reeve testified that Passaro called him before purchasing securities for the accounts (*id.* at 48-49). Nor did Reeve testify that Mandell said anything during their "personal chat" or during his presentation at the House of Lords — the only two occasions that Reeve claimed to have had contact with Mandell — that would give Reeve reason to abdicate his own judgment and trust Mandell instead; for example, Reeve did not testify that Mandell told him to trust him, or that Mandell made any representations about any of the securities that Claimants bought on Passaro's recommendation. Nothing in this testimony in any way suggests, much less proves, that Mandell took any actions that caused Claimants to repose trust and confidence in him (as opposed to Passaro, their broker), or that Mandell had a relationship with Claimants that would give rise to a fiduciary duty. Absent some evidence that Mandell acted to create or maintain such a relationship, it was

manifest disregard of the law and the facts for the arbitrators to find against Mandell on this claim.

## C.     Failure to Supervise

As with the breach of fiduciary duty claim, the arbitrators manifestly disregarded the law and the facts in finding against Mandell on the failure to supervise claim.  The law below, which was briefed to the arbitrators in the emergency motion, clearly precludes a liability finding against Mandell on this claim.  Moreover, there was no evidence presented that Mandell actually supervised Passaro.  The arbitrators ignored this plain law and facts in issuing the award against Mandell.

The Eighth Count of the Statement of Claim alleges that Claimants were damaged "as a direct and proximate result of the intentional and negligent failure to supervise" by Mandell (Hoffman Dec., Ex. 2 at ¶ 72).  This claim also fails as a matter of law, for two reasons:  (1) Mandell did not supervise, and was neither the direct nor indirect supervisor of, Passaro; and (2) as a matter of law there is no private right of action under the securities laws or applicable FINRA rules for failure to supervise.

### 1.     *Mandell Was Not Passaro's Supervisor*

Although the Statement of Claim alleges conclusorily that Mandell supervised Passaro (Hoffman Dec., Ex. 2 at ¶¶ 9, 67-72), they did not establish this as a fact at the hearing.  The Statement of Claim alleges that Passaro was located in GCG's Boca Raton office (*id.* at ¶ 5), and identifies respondent Shea as GCG's Chief Operating Officer and Chief Supervisory Principal of the Boca Raton office (*id.* at ¶ 8).  Respondent Goss is identified as GCG's Chief Compliance Officer (*id.* at ¶ 7).  This would mean that Shea was Passaro's direct supervisor and Goss was his indirect supervisor.  By contrast, Claimants do not allege that Mandell had any sort of

supervisory role at GCG at all, much less that he actually was a direct or indirect supervisor of Passaro (*see id.* at ¶ 6).

At the hearing, Claimant's counsel argued that Mandell was Passaro's supervisor because he was (a) the CEO of GCG, and (b) the holder of a securities supervisory license (Hoffman Dec., Ex. 29 at 69). This establishes, at best, that Mandell *might have* supervised Passaro at times when Shea and Goss were both unavailable, assuming there ever were such times. But Claimants made no evidentiary showing whatsoever that Mandell ever actually supervised Passaro or, indeed, that Mandell had any knowledge of how Passaro dealt with Claimants and their account. In short, there are no facts of a legally significant nature in the record that would allow a reasonable arbitrator to conclude that Mandell failed to supervise Passaro. This is akin to the situation in *Daily News, LP*, 1999 WL 1095613, above, where the arbitrator, ignored critical facts in issuing his award. Even if Mandell had been present at the hearing, he would have been entitled to an award in his favor at the close of Claimant's direct case without offering any defense on this issue, because Claimants failed to make out a *prima facie* case on the issue. The arbitrators manifestly disregarded this absolute failure of proof by Claimants and issued the Award against Mandell.

### 2.  *There is No Private Right of Action for Failure to Supervise*

In 1994, the United States Supreme Court struck down a half-century of case law that had recognized an implied private right of action against registrants and associated persons for aiding and abetting violations of the federal securities laws because Congress had not explicitly granted such a private right of action. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 184 (1994) ("[w]hen Congress wished to provide a private damages remedy, it knew how to do so and did so expressly"). *Central Bank* was the culmination of more

than fifteen years of warnings by the Supreme Court that it would not uphold lower courts' efforts to create private implied causes of action where no intent to create a private right of action was manifested by Congress. *See Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979). Here, because Congress has not explicitly provided a private right of action to sue for failure to supervise, Claimants' claims, to the extent that they are founded on the federal securities laws, should have been dismissed.

Nor does Claimant have a private right of action under FINRA's Conduct Rule 3010 (*see* Hoffman Dec., Ex. 2 at ¶ 69). Self-regulatory organizations such as FINRA do not have the authority on their own to create private rights of action under their rules; such power must be granted by Congress, *see Shahmirzadi v. Smith Barney, Harris Upham & Co., Inc.*, 636 F. Supp. 49, 52 (D.D.C. 1985). A number of courts have held that Congress did not confer upon the NASD or other self-regulatory organizations the right to delegate private rights of action under its rules. In *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir. 1980), the plaintiff, suing her brokerage firm, alleged violations of NASD Conduct Rule 2310 and New York Stock Exchange Rule 405. The Ninth Circuit affirmed the lower court's rejection of both claims, finding that "[t]he Securities Exchange Act does not expressly authorize private actions for stock exchange rule violations." *Id.* at 679. Plaintiff argued that Sections 6 and 27 of the Exchange Act permits such private rights of action; the court disagreed, finding that the Supreme Court in *Touche Ross, supra*, had explicitly rejected this theory and there was no other source for such a private right of action. Plaintiff also argued that Section 15A(b)(6) of the Exchange Act -- which requires a self-regulatory organization such as the NASD to adopt disciplinary rules -- impliedly authorizes private rights of action for violation of those rules. The Ninth Circuit was not persuaded, stating:

> No provision in the Securities Exchange Act explicitly provides for a private action for violations of stock association rules.

\*　　　\*　　　\*

> Section 15A(b)(6) does not in itself imply that Congress intended to create a private action. Its language, like that of §§ 6(b) and 17(a) of the Securities Exchange Act, "neither confers rights on private parties nor proscribes any conduct as unlawful." [Citations omitted.] Based upon the standards in *Touche Ross* and *Transamerica*, we conclude there is no implied right of action for an NASD rule violation.

\*　　　\*　　　\*

> We believe the entire statutory scheme makes it "highly improbable that 'Congress absentmindedly forgot to mention an intended private action'" in either § 6(b) or § 15A(b)(6) [citation omitted].

*Id.* at 681 (quoting *Touche Ross*, 442 U.S. at 569; *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 742 (1979) (Powell, dissenting). *See also Unity House, Inc. v. No. Pacific Investments, Inc.*, 918 F. Supp. 1384, 1388-89 (D. Haw. 1996), *aff'd*, 175 F.3d 1022 (9th Cir. 1999) (court agreed that "there is no private right of action for violation of NYSE and NASD rules"); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990), *cert. denied*, 499 U.S. 976 (1991) (no private right of action for violating Section 15(b) of the Exchange Act).

In view of the foregoing, Mandell has a complete defense against the failure to supervise claim in the Eighth Count of the Statement of Claim. This law, too was presented to the arbitrators in the emergency motion (*see* Hoffman Dec., Ex. 25 at 12-14) and was not controverted by Claimants either in their opposition to the motion or at the hearing. To the extent that the Award was based on this claim, it could have been issued only through manifest disregard of the law.

### C.   Control Person and *Respondeat Superior* Liability

Although Claimants did not allege separate claims against Mandell premised on control person liability or *respondeat superior*, in the Statement of Claim Claimants alleged that Mandell is

> responsible for the supervision of Passaro's sales practices, and the periodic inspection of customer accounts to reasonably detect and prevent fraud, unauthorized trading, and the sale of unsuitable securities to customers.  As such, Mandell...had the opportunity and ability to control the activities of Passaro, and therefore [is] liable to Claimants under the common. Law doctrine of *respondeat superior* and as a control person pursuant to Section 20(a) of the [Securities] Exchange Act of 1934, 15 U.S.C. § 78(t) [footnote omitted].

Hoffman Dec., Ex. 2 at ¶ 9.  At the hearing, Claimants' counsel argued conclusorily that Mandell should be held liable as a control person (*id.*, Ex. 29 at 69).  For the reasons that follow, Mandell has a complete defense against both these claims as well.  To the extent that the Award was premised on the arbitrators' finding of liability on those claims, it was issued in manifest disregard of the law and the facts.

### 1.   *Respondeat Superior*

Under New York law, the doctrine of *respondeat superior* is simple — *the employer* is liable for the wrongful conduct of its employees, done in the course of the employee's official duties, for the benefit of the employer and consistent with the standards, rules and procedures of the employer.  *See Adams v. New York City Transit Authority*, 211 A.D.2d 285, 626 N.Y.S.2d 455 (1st Dept. 1995), *aff'd*, 88 N.Y.2d 116, 643 N.Y.S.2d 511 (1996).  *See also Rausman v. Baugh*, 248 A.D.2d 8, 10-11, 682 N.Y.S.2d 42, 43-44 (2d Dept. 1998) ("[u]nder the doctrine of respondeat superior, an employer is answerable for the torts of an employee who acts within the scope of his or her employment [citation omitted].  The purpose of the rule is to render the

employer responsible, in proper cases, for the employee's tortuous acts, which although errant, were done in furtherance of the employer's business [citation omitted]. The theory is that the employer should, as a required cost of doing business, in an appropriate case, compensate a party harmed by an employee who was acting not on his or her own behalf, but in the employer's service [citation omitted]").

While "the doctrine holds *employers* vicariously liable for the acts of employees[,] *it does not apply to executive personnel who fall into the category of employees*." *Patton v. Dumpson*, 498 F. Supp. 933, 943 (S.D.N.Y. 1980) (emphasis added). Mandell — although the CEO of GCG during a portion (but not all) of the time Claimants' account was allegedly being mishandled by Passaro — was an *employee* of GCG, which also was the employer of Passaro. Claimants do not allege in the Statement of Claim that Mandell directly employed or paid Passaro, nor did they offer any evidence at the hearing showing that Mandell, as opposed to GCG, was Passaro's employer. This is a critical fact, which the arbitrators simply ignored, although it was briefed to them in the emergency motion and, therefore, they should have insisted on proof on the issue. Mandell is thus not subject to liability under the doctrine of *respondeat superior*. This clear law was presented to the arbitrators in the emergency motion (Hoffman Dec., Ex. 25 at 14-15), and was not controverted by Claimants at the hearing or in the opposition to the motion.

### 2.   *Control Person Liability*

Similarly, Claimants failed to offer evidence that would warrant a finding as a matter of law that Mandell was a control person of Passaro, the principal wrongdoer here. Nor did Claimants present any fact evidence that would permit a finding that Mandell was a culpable

actor with respect to Passaro's improper conduct.  Absent this evidence, the Award was issued in

manifest disregard of the law and facts.

Control person liability arises from Section 20(a) of the Securities Exchange Act of 1934,

15 U.S.C. § 78t(a), which provides in relevant part:

> Every person who, directly or indirectly, controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person is liable, *unless the controlling person acted in
> good faith and did not directly induce the act or acts constituting
> the violation or causes of action.*

(Emphasis added.)  To establish a *prima facie* case of control person liability, a plaintiff must

show (1) a primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, *in some meaningful sense*, a culpable participant in the

controlled person's fraud.  *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d

Cir. 2007).  In *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973), the Court of Appeals

for the Second Circuit established a two-part inquiry to determine derivative liability as a control

person.  First, the court must ascertain whether the nature of the relationship between the

purported controller and the controlee is such that the respondent possesses the actual authority

to influence and direct the activities of the primary wrongdoer.  Second, even if the respondent

has such authority, a respondent is not liable unless he is also a culpable participant in the fraud.

*Gordon v. Burr*, 506 F.2d 1080, 1085-1086 (2d Cir. 1974).

"Actual control is essential to control person liability."  *In re Alstom SA*, 406 F. Supp.2d

433, 486 (S.D.N.Y. 2005); *see also In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2005

WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) ("[t]o be liable as a control person, the defendant

'must actually possess, in fact, rather than in theory, the ability to direct the actions of the

controlled person.'") (quoting *Wallace v. Buttar*, 239 F. Supp.2d 388, 396 (S.D.N.Y. 2003)).

Control in this context "is not the mere ability to persuade, but almost 'always means the

practical ability to direct the actions of people who issue or sell securities.'" *In re Flag Telecom*

*Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005). Moreover, the Section

20(a) defendant must not only have actual control over the primary violator, but have "'actual

control over the transaction in question.'" *In re Global Crossing*, 2005 WL 1875445, at *3. A

finding of control person liability requires "an individuated determination of a [respondent's]

control of the primary violator as well as a [respondent's] particular culpability." *Bouguslavsky*

*v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *In re Global Crossing*, 322 F. Supp.2d at 351

(noting that control person analysis is a "decidedly fact-based determination"). In conducting

such analyses, courts have held that officer or director status alone does not constitute control for

the purposes of Section 20(a) liability. *Alstom*, 406 F. Supp.2d at 487-88; *see also Rich v.*

*Maidstone Fin., Inc.*, No. 98 Civ. 2569, 2002 WL 31867724, at *11 (S.D.N.Y. Dec. 20, 2002).[10]

The foregoing clear law was presented to the arbitrators in the emergency motion

(Hoffman Dec., Ex. 29 at 15-16), and was not controverted by Claimants either in their

opposition to the motion or at the hearing. Claimants pleaded no facts in the Statement of Claim,

and offered no evidence at the hearing, that would establish that Mandell had "'actual control

over the transaction in question," *Global Crossing*, 2005 WL 1875445, at *3. Even if it were

true that Mandell controlled Sky Capital, that would be insufficient to establish liability against

him as a control person of GCG, because Claimants failed to show that Mandell controlled

Passaro or, indeed, was aware at all of Passaro's activities with regard to Claimants. Similarly,

---

[10]     A state of mind of at least recklessness is required to plead culpable participation under Section 20(a). *Alstom*, 406 F. Supp. 2d at 504. "To qualify as reckless conduct, the [alleged conduct] must have been 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.*

Claimants offered no evidence that Mandell was a culpable participant in Passaro's fraud against them.[11]  In fact, counsel conceded that he had no idea what Mandell did with the money the indictment alleges were raised by GCG (Hoffman Dec., Ex. 29 at 71).  To the extent that the Award as against Mandell was premised on control person liability, it is in manifest disregard of the law and the facts.

**POINT III**

**THE AWARD MUST BE VACATED BECAUSE
MANDELL WAS DEPRIVED OF THE RIGHT
TO PARTICIPATE MEANINGFULLY IN
THE ARBITRATION BY FINRA'S MISCONDUCT**

Even putting to one side the arbitrators' misconduct in refusing to postpone the hearing and their manifest disregard of the law as set forth above, the Award still should be vacated because, as a practical matter, Mandell as a *pro se* litigant was deprived of his right to participate meaningfully in the Arbitration.  Mandell's deprivation occurred in three ways: (a) he did not understand, and FINRA did not make clear to him, that he was entitled to discovery from Claimants; (b) he did not understand, and FINRA disregarded, that one of the arbitrators had made comments indicating bias in favor of Claimants' counsel; and (c) FINRA, by its handling of the pre-hearing proceedings, including its failure properly to serve the Statement of Claim in him, its failure to allow him to participate in the pre-hearing conference in which the hearing date was set, and its failure to decide his renewed motion to stay the Arbitration during the

---

[11]     At the hearing, Claimants' counsel argued, based on the allegations in the indictment and Mandell's ownership of an interest in one of the companies Claimants bought stock in, that Mandell somehow was involved in a "common course of conduct" with Passaro (Hoffman Dec., Ex. 29 at 67). This is plainly illogical.  Mandell cannot be found to be a control person of Passaro based on allegations in a pleading in another case, which counsel himself admitted were unproved (*id.*), absent some actual proof that Mandell did engage in culpable conduct with respect to the claims in the Arbitration.  It should be noted that none of the allegations in the indictment specifically identify Claimants or their accounts (*id.*, Ex. 2).  The arbitrators, to the extent the assigned control person liability to Mandell based on this illogical chain of argument, manifestly disregarded the facts.

pendency of the criminal action, prejudiced Mandell. This course of conduct tainted the entire Arbitration process and renders the Award defective.

FINRA was obliged to provide a proceeding that was not "fundamentally unfair," *see* authorities cited above at 12-13. This is even more the case for a litigant like Mandell, who was not represented by counsel. Instead, at every step Mandell's ability to participate meaningfully in the Arbitration was curtailed by FINRA's sloppy practices, unclear instructions and general intransigence.

As noted above, Mandell never received any discovery from Claimants, although he had the right under Rule 12506 of the Code to obtain mandatory discovery. Mandell also had the right, under Rule 12507, to request other discovery from Claimants. Mandell, as a *pro se* litigant, was unaware of these rights and so was unable to safeguard them. When he told FINRA that he wanted discovery, the staff told him that he would get it "later," but never followed through to make sure he got what he was entitled to (Mandell Dec. at ¶ 8).

Moreover, as discussed above, Arbitrator Kauff made disclosures and statements that gave Mandell reasonable cause to believe that he was biased in favor of Claimant's counsel, with whom he had a pre-existing relationship (Mandell Dec. at ¶ 9). As a *pro se* litigant, Mandell did not know how to object to this apparent bias, and FINRA made no effort to assist him.

Finally, in addition to the failure by FINRA to include him in the pre-hearing teleconference at which the hearing date was set, discussed thoroughly above, FINRA also sat on Mandell's renewed motion to stay the Arbitration pending the outcome of the criminal case against him. After frequent calls from Mandell, FINRA finally informed him, three days before the hearing was set to begin, that his renewed motion was denied. Thus, he had no genuine opportunity to prepare to defend himself or to retain counsel to do so.

All of these instances, which are the result of FINRA's inattention and sloppiness, collectively tainted the Arbitration and the hearing.  No Award against Mandell that resulted from such a fundamentally unfair process could have been proper.  Thus, under 9 U.S.C. § 10(a), FINRA engaged in misconduct that warrants vacating the Award.

## CONCLUSION

For the reasons set forth above, Petitioner Ross H. Mandell respectfully requests that the Award be vacated as to him.

Dated: New York, New York
       August 31, 2010

Respectfully submitted,

HOFFMAN & POLLOK LLP

By:_____
       Jeffrey C. Hoffman
*Attorneys for Petitioner Ross H. Mandell*
260 Madison Avenue, 22nd Floor
New York, New York 10016
Tel: (212) 679-2900
Fax: (212) 679-1844

*Of Counsel*:

    William A. Rome
    Lisa Rosenthal
    Samira H. Desai